NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

TODD PHOTIS,

    Plaintiff,

v.

SEARS HOLDING CORP., et al.,

    Defendants.

Civil Action No. 11-cv-6799 (JAP)

**OPINION**

PISANO, District Judge

In this employment discrimination case, Plaintiff Todd Photis ("Plaintiff") suffered a seizure and alleges that Defendants Sears Holding Corporation and Michael Smith ("Smith"), Kmart's Regional Human Resources Director for the Northeast Region, (collectively "Defendants") terminated his employment due to disability and perceived disability discrimination. Defendants, however, assert that they terminated Plaintiff because he violated the company's Code of Conduct. Presently before this Court is Defendants' Motion for Summary Judgment [docket # 15], in which they argue that there is no genuine issue of material fact regarding Plaintiff's termination. This Court reaches its decision without oral argument. *See* Fed. R. Civ. P. 78. For the reasons outlined below, Defendants' Motion is granted.

    **I.    BACKGROUND**

        **A. Plaintiff's Job at Kmart**

In September 2009, Defendants hired Plaintiff to work at the Kmart store in East Brunswick, New Jersey as an Assistant Store Manager [docket # 15-3, Ex. B to Defendants'

1

Statement of Undisputed Material Facts, Deposition of Todd Photis ("Photis Dep."), 24:13-25]. Three months later, Plaintiff became an Operations Manager, and approximately three to four months after that, Defendants promoted Plaintiff to Store Manager. *Id.* at 25:2-4, 25:6-7. Plaintiff's duties as Store Manager included running the store, managing employees, "[d]riving sales, controlling expenses, having acceptable store conditions, following corporate policies, [and] training and developing" store employees. *Id.* 26:19-25; docket # 15-3, Ex. C to Defendants' Statement of Undisputed Material Facts, Deposition of Michael D. Hawd ("Hawd Dep."), 53:24-54:13. Michael Hawd ("Hawd") was Kmart's District Manager for the district that included the East Brunswick store, and thus, Plaintiff's supervisor. Hawd Dep., 17:24-18:15; Hawd Dep. Ex. 2.

### B. Kmart's Shop Your Way Rewards Program

Kmart's Shop Your Way Rewards ("SYWR") program is a customer loyalty program in which customers "gain points off of their purchase and . . . can redeem those points later on as cash for future purchases" [docket # 15-3, Ex. E to Defendants' Statement of Undisputed Material Facts, Deposition of Michael Houde ("Houde Dep."), 36:7-11]. With the help of associates, customers enroll in the SYWR program and receive a SYWR account number and card. The program was a "major part" of Kmart's "marketing effort," and one of the purposes of the program was to "attract customers to the store" [docket # 15-3, Ex. D to Defendants' Statement of Undisputed Material Facts, Deposition of Michael S. Smith ("Smith Dep."), 75:13-14, 76: 4-7]. As a result, Defendants established an enrollment goal of ten percent of customer transactions, meaning one out of every ten customers should be enrolled in the SYWR program. Hawd Dep., 90:11-20.

In connection with the SYWR program, Kmart implemented a set of program rules. Smith Dep., Ex. 2. Pursuant to the program rules, "SYWR enrollments cannot be created by

extracting customer information from email records, phone books, or other sources." *Id.* Additionally, "[a]n associate can never sign up a customer for a SYWR without the customer being present and without getting the customer's approval to open an SYWR account." *Id.* Defendant communicated these rules to employees through e-mails and conference calls, and the Store Managers discussed the rules with their teams in morning huddles. Hawd Dep. 105:1-3; Smith Dep., 18:9-21; Smith Dep., Ex. 2. The e-mail communications specifically state that a violation of the SYWR rules "will result in discipline, up to and including immediate termination of employment." Smith Dep., Ex. 2.

As a Store Manager, Plaintiff was required to know and abide by the SYWR program rules. Hawd Dep., 160:20-22; Photis Dep., 49:10-14. Furthermore, Plaintiff testified that he was required to make sure that the associates in the East Brunswick store were aware of the SYWR program rules. Photis Dep., 50:7-10; Smith Dep., 82:5-8. Moreover, Plaintiff testified that he knew that if someone did not follow the program rules, they could be terminated. Photis Dep., 50:12-15. Furthermore, Plaintiff stated that as Store Manager, he was required to provide guidance and leadership to his associates and had to set a good example for them. *Id.* at 53:11-19.

### C. Plaintiff's Misconduct

On January 8, 2011, Bhavesh Patel ("Patel"), the Loss Prevention Manager in Kmart's East Brunswick store, observed on a live video feed Plaintiff and Assistant Store Manager Anthony Feijo ("Feijo") enter phone numbers from their cell phones into the RMU, a handheld scanning device, and then scan thirteen SYWR cards with the RMU [docket # 15-4, Ex. H to Defendants' Statement of Undisputed Material Facts, Bhavesh Patel's Associate Witness Statement ("Patel Associate Witness Statement")]. Subsequently, Plaintiff and Feijo threw all

thirteen cards in the trash.  *Id.*  These SYWR cards were activated without a customer present, in violation of the program rules.

Patel told Michael Houde ("Houde"), the Acting District Loss Prevention Manager, what he saw because Jason Alexander, the District Loss Prevention Manager for the district that included the East Brunswick store, was on vacation at the time [docket # 15-4, Ex. G to Defendants' Statement of Undisputed Material Facts, Deposition of Jason D. Alexander ("Alexander Dep."), 8:7-10, 14-16; Houde Dep., 50:7-10].  Houde determined that enrolling customers who were not present in the SYWR program raised "some integrity issues" and was a "serious enough incident to require an investigation."  Houde Dep., 57:5-17.  Therefore, on January 11, 2011, Houde contacted the Associated Services Organization ("ASO"), a service organization that supports employees regarding human resources issues, to initiate the investigation.  Houde Dep., 30:10-18, 61:20-24; docket # 15-4, Ex. F to Defendants' Statement of Undisputed Material Facts, Deposition of Gail Michal ("Michal Dep."), 11:25; Smith Dep., 35:5-12.

The investigation concerned Plaintiff and Feijo creating SYWR accounts for people who were not present at the time the accounts were created.  Alexander Dep., 28:7-10; Photis Dep., 92:11-17.  Toward the end of January 2011, Alexander took over the investigation from Houde after he returned from vacation.  Alexander Dep., 8:7-10; Houde Dep., 50:21-23.  Alexander began the investigation by contacting Patel and Smith.  Alexander Dep., 16:12-18; Smith Dep., 13:13-24, 14:7-12.  Subsequently, on February 17, 2011, Alexander interviewed Plaintiff and Feijo separately, with Houde present as a witness.  Alexander Dep., 28:11-17; Houde Dep., 51:3-14.  During Plaintiff's interview, Plaintiff stated that he signed up a handful of friends and/or family members for the SYWR program, and although these individuals were not present to enroll in the program, Plaintiff received their permission to sign them up.  Photis Dep., Ex. 13.

4

Additionally, Plaintiff stated that he has "not seen or . . . been made aware of anyone in this building fraudulently signing up SYWRs or anything else that could be a violation of company policy . . . ." *Id.* During Feijo's interview, however, Feijo stated that Plaintiff "hinted to sign up friends & family" to meet the SYWR program goals [docket # 15-4, Ex. I to Defendants' Statement of Undisputed Material Facts, Statement of Anthony Feijo ("Feijo's Statement")]. Moreover, Feijo stated that if he knew he was doing something wrong, he would not have done it. *Id.* Moreover, Alexander interviewed Leomar Simbre and Shantay Simpson, the other Assistant Store Managers in the East Brunswick store. Alexander Dep., 14:21-15:1; docket # 15-4, Ex. J to Defendants' Statement of Undisputed Material Facts, Statement of Shantay Simpson ("Simpson's Statement"); Ex. K to Defendants' Statement of Undisputed Material Facts, Statement of Leomar Simbre ("Simbre's Statement"). Simpson stated that Plaintiff told associates to "sign up relatives and neighbors," and Plaintiff "once suggested . . . [getting] the phonebook to" obtain new SYWR accounts. Simpson Statement. Subsequently, Alexander verified that the SYWR cards discarded by Plaintiff and Feijo were never used. Smith Dep., 50:8-51:8, 79:2-6. Due to all of this information, Defendant suspended Plaintiff on February 19, 2011, pending the investigation. Photis Dep., 92:5-6.

### D. Plaintiff's Seizure

On February 7, 2011, prior to Plaintiff's suspension but after the investigation began, Plaintiff had a seizure and was admitted to the hospital. Compl. ¶ 4; Photis Dep., 65:14-16. Although Plaintiff was in the hospital overnight and the doctors ran various tests, he was never diagnosed with anything, and the test results were inconclusive. Photis Dep., 65:6-25; 98:25-99:1. Plaintiff returned to work on February 9, 2011. *Id.* at 75:18-21, 79:19-24.

Plaintiff worked every day from his return to work on February 9, 2011 until he was suspended on February 19, 2011. *Id.* at 90:1-12. He never requested an accommodation. *Id.* at

5

77:10-12; 77:22-78:1; 100:6-11. In fact, Plaintiff never spoke with Smith after his seizure [docket # 15-4, Ex. M to Defendants' Statement of Undisputed Material Fact, Verified Statement of Michael Smith ("Smith's Verified Statement"), ¶ 3]. In addition, although Plaintiff interacted with Hawd after his return to work, Hawd "just showed the normal concern for how [Plaintiff] look[ed], [and] how [he] felt . . . ." Photis Dep., 76:6-7. Hawd never told Plaintiff to go home or asked him to leave the workplace. Photis Dep., 87:11-13; Hawd Dep., 144:17-19.

When Plaintiff returned to work, he provided Hawd with a copy of his hospital release form. Photis Dep., at 71:19-23; *Id.* at Exhibit 11, Hospital Release Form. Smith, however, told Hawd that if Plaintiff was under a doctor's care, then the company would need a release from the doctor "to understand what . . . [Plaintiff's] restrictions may or may not be." Smith Dep., 62:7-11; *see also* 58:6-17. Hawd communicated this information to Plaintiff. Photis Dep., 72:3-7. Plaintiff testified that he obtained a doctor's note on February 16, 2011, and although he was seeking a note stating that he could work, the doctor's note instructed him not to work until he underwent further evaluations. *Id.* at 89:20-25. Plaintiff, however, did not give Hawd the note until February 19, 2011, when he was being walked out of the building due to his suspension. *Id.* at 91:16-22. Hawd did not mention Plaintiff's medical condition at this time. *Id.* at 98:14-17.

Since February 7, 2011, Plaintiff has not had any more seizures, and he has not been in the hospital. *Id.* at 99:10-15. On February 23, 2011, he had a follow-up appointment with his doctor who told him that she wanted to conduct a sleep study. *Id.* at 66:14-20; 99:16-20. Plaintiff, however, never set up the appointment because he "start[ed] to feel a little better" and did not have insurance. *Id.* at 66:19-67:9.

### E. Plaintiff's Termination

Based upon the information gathered in the investigation, Defendants determined that Plaintiff lied during the investigation when he said he has "not seen or have been made aware of

anyone in this building fraudulently signing up . . . [SYWR] or anything else that could be a violation of company policy" or "even frowned upon." Hawd Dep., 113:10-19, 116:5-24; Michal Dep., 49:7-13; Smith Dep., 38:9-24. This statement contradicts Feijo and Simpson's statements, in which they state that Plaintiff told them to sign up friends and family members to meet the SYWR enrollment goals, in violation of program rules. *See* Feijo and Simpson's Statements. Smith, Hawd, Gail Michal, an HR consultant in Kmart's Human Resources Department ASO, and John Hardgrove, a manager for the ASO team, discussed Plaintiff's actions and determined that they raised "an integrity issue"; as a result, they decided that "termination would be appropriate." Michal Dep., 50:14-23; *see also* Hawd Dep., 112:22-113:13; Smith Dep., 69:3-10; Michal Dep., 11:20-12:3; 13:9-10; 44:12-19.[1]

Thus, on February 24, 2011, Defendant terminated Plaintiff's employment because he violated the company's Code of Conduct by making false statements during the investigation into the SYWR cards. Photis Dep., 30:10-11, 49:7-11, 100:12-14; Ex. L to Defendants' Statement of Material Facts, Verified Statement of Michael Hawd ("Hawd's Verified Statement"), ¶ 7; Smith's Verified Statement, ¶ 5. Because Plaintiff was suspended, Alexander and Hawd called Plaintiff and told him about the termination over the telephone. Hawd Dep., 160:4-10; Hawd's Verified Statement, ¶¶ 3 & 4; Photis Dep., 100:12-22. No one mentioned Plaintiff's alleged disability, perceived disability, or medical condition during the conversation, and Plaintiff testified that Defendant terminated his employment because he violated the Code of Conduct. Hawd's Verified Statement, ¶¶ 3 & 4; Photis Dep., 30:10-11, 92:8-10.

---

[1] Feijo was not suspended or terminated because he acknowledged what he had done. Hawd Dep., 131:5-14. Instead, he received a "Final Notice of Correction for fraudulent . . . [SYWR] enrollments and failure to report the inappropriate actions of [the Store Manager, Plaintiff,] . . . once it was confirmed that this process was wrong" [docket # 22, Ex. H to Plaintiff's Brief in Opposition, deposition of Gail Michal, 63:24-64:21].

### F. Plaintiff's Allegations and Procedural History

On October 21, 2011, Plaintiff filed a Complaint in the Superior Court of New Jersey, Middlesex County against Defendants, alleging: (1) a failure to provide reasonable accommodations in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("NJLAD"); (2) disability discrimination in violation of NJLAD; (3) perceived disability discrimination in violation of NJLAD; (4) intentional infliction of emotional distress; and (5) aiding and abetting discrimination based upon his disability and perceived disability. On November 18, 2011, Defendants removed the case to this Court based on diversity jurisdiction. They filed the Motion for Summary Judgment currently at issue on December 28, 2012.

## II. DISCUSSION

### A. Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine dispute of material fact exists, the court must view the facts in the light most favorable to the nonmoving party and extend all reasonable inferences to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Stephens v. Kerrigan*, 122 F.3d 171, 176–77 (3d Cir. 1997). The Court is not required to "weigh the evidence and determine the truth of the matter" but instead need only determine whether a genuine issue necessitates a trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

On a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986). If the moving party makes this showing, the burden shifts to the nonmoving party to present evidence that a genuine fact issue compels a trial. *Id.* at 324. The nonmoving party must then offer admissible evidence that establishes a genuine issue of material fact, *id.*, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

B.     **NJLAD Claims**

Defendants argue that summary judgment should be granted on counts one, two, and three — the disability, perceived disability, and failure to accommodate claims — because Plaintiff failed to meet his burden under the *McDonnell Douglas* test. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, Defendants assert that Plaintiff cannot establish a prima facie case of disability or perceived disability discrimination. Moreover, Defendants contend that Plaintiff cannot show that they failed to accommodate his alleged disability because assuming Plaintiff had a disability, he never requested an accommodation. Second, Defendants assert that they have a legitimate, nondiscriminatory reason for terminating Plaintiff — he lied during the investigation, thereby violating the Code of Conduct. Lastly, Defendants contend that Plaintiff cannot establish that its legitimate, nondiscriminatory reason is pretextual or that it possessed discriminatory intent because: (1) the investigation began one month before Plaintiff had his seizure; (2) at least three individuals, Hawd, Smith, and Michal, thought that Plaintiff lied to the company; and (3) there were no similarly situated individuals who were treated more favorably than Plaintiff since Feijo was not a Store Manager and was truthful.

Plaintiff, however, argues that this Court should deny summary judgment because genuine issues of material fact exist regarding Plaintiff's NJLAD claims. First, Plaintiff asserts

that he has established a prima facie case of disability and perceived disability discrimination. Second, Plaintiffs contend that Defendants' reasons for Plaintiff's termination are pretextual because: (1) Plaintiff did not lie during the investigation, and instead, he admitted that he enrolled customers in the SYWR program without them being present but with their permission; and (2) he was unaware that he violated the SYWR rules because there were no formal and accessible guidelines or procedures governing the program. Lastly, Plaintiff argues that Defendants failed to accommodate his disability because: (1) Defendants knew about Plaintiff's disability; (2) Plaintiff made it clear to Defendants that he wants assistance for his disability by telling Defendants he would be absent from work, providing medical records, and advising of his doctor's refusal to clear him for work until further testing; and (3) Defendants did not make a good faith effort to assist the employee in seeking accommodation and offering leave paperwork.

Defendants filed a reply brief, again arguing that Plaintiff failed to demonstrate disability or perceived disability discrimination and did not show a failure to accommodate.

"New Jersey courts have adopted the three-step federal burden-shifting framework established in *McDonnell Douglas Corp. v. Green*," 411 U.S. at 802, "to assess discriminatory discharge claims under" NJLAD. *Sunkett v. National Gypsum Co.*, 2011 WL 6719776, *7 (D.N.J. Dec. 21, 2011). Under the *McDonnell Douglas* analysis, first, a "plaintiff must establish a prima facie case of discrimination." *Jones v. School District of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999). If the plaintiff establishes a prima facie case, "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's" termination. *Id.* (internal quotation omitted). Then, the burden shifts again, and plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant

were not its true reasons, but were a pretext for discrimination." *Id.* The ultimate burden of persuasion "remains at all times with the plaintiff." *Id.*

### 1. Plaintiff Has Not Demonstrated A Prima Facie Case of Disability or Perceived Disability Discrimination

To establish a prima facie case of disability or perceived disability discrimination, a plaintiff must prove that: "(1) he was disabled (or perceived to be disabled); (2) he was objectively qualified for his . . . former position; (3) he was terminated; and (4) the employer sought someone to perform the same work after the plaintiff's discharge." *Simonetti v. Broadridge Fin. Solutions, Inc.*, 2012 WL 32931, *10 (D.N.J. Jan. 5, 2012). "Disability" is defined as:

> physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy and other seizure disorders, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or any mental, psychological or developmental disability, including autism spectrum disorders, resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. Disability shall also mean AIDS or HIV infection.
>
> [N.J.S.A. § 10:5-5(q).]

Thus, the term "disability" includes "two specific categories": physical and non-physical. *Nguyen v. Wal-Mart*, 2013 WL 3222498, *6 (D.N.J. Jun. 25, 2013). "To meet the physical standard, a plaintiff must prove that he . . . is (1) suffering from physical disability, infirmity, malformation or disfigurement; (2) which is caused by bodily injury, birth defect or illness . . . ."

*Id.* Expert medical evidence is required if "the existence of a handicap is not readily apparent . . . ." *Id.*

Here, Plaintiff has not established a prima facie case of disability discrimination because Plaintiff has not shown that he is disabled. Although Plaintiff alleges that his seizure constitutes a disability, he was never diagnosed with a seizure condition or any other disability, and the test results conducted by the hospital after the seizure were inconcolusive. *See* Photis Dep., 65:6-25, 98:23-99:1; *see also McCoy v. Port Liberte Condominium Association # 1*, 2003 WL 23330682, *30-31 (D.N.J. Sept. 12, 2003) (finding that plaintiff did not establish a prima facie case of disability discrimination where the record did "not show that any doctor ha[d] diagnosed McCoy's condition"). In addition, Plaintiff has not provided the Court with any expert medical evidence to establish the existence of a disability. *See Nguyen*, 2013 WL 3222498, at *6. Lastly, Plaintiff has not had any more seizures since February 7, 2011, meaning "there is no evidence which indicates that Plaintiff's medical condition was anything" more than "a condition of limited duration" or a "temporary emergency situation." *Spagnoli v. Brown & Brown Metro, Inc.*, 2007 WL 2362602, *9 (D.N.J. Aug. 15, 2007); *see also* Photis Dep., 99:10-15. Thus, because the evidence fails to demonstrate that Plaintiff had a disability, there is no genuine issue of material fact regarding whether Plaintiff suffered from disability discrimination, and Defendants are entitled to judgment as a matter of law on this claim.

Furthermore, "NJLAD protects employees who are . . . perceived to be disabled from adverse employment action . . . ." *Glenn v. Lawrence Twp. Police Dep't*, 2012 WL 933335, *7 (D.N.J. Mar. 20, 2012). "In order to demonstrate that a plaintiff is 'perceived to have' a disability, the plaintiff must show that the employer 'entertain[ed] misperceptions about the [plaintiff], either believing that the individual has a substantially limiting impairment that he or

she does not have or that the individual has a substantially limiting impairment when, in fact, the impairment is not as limiting as the employer believes.'" *Id.*

Plaintiff, however, has failed to establish that Defendants perceived him as being disabled. Plaintiff worked every day from the date he returned to work until the date he was suspended, making it unlikely that someone would think he was disabled. Photis Dep., 90:1-12. Additionally, Plaintiff testified that Hawd showed him "normal" concern after he returned to work and never told Plaintiff to go home or asked him to leave the workplace. *Id.* at 76:6-7, 87:11-13. Moreover, Plaintiff acknowledged that Hawd did not mention his medical condition when Plaintiff was suspended. *Id.* at 98:14-17. Furthermore, neither Hawd nor Smith perceived Plaintiff to have a disability or think Plaintiff was unable to work. *See* Hawd's Verified Statement, ¶ 6; Smith's Verified Statement, ¶¶ 3, 4. Instead, both Hawd and Smith stated that Defendants terminated Plaintiff for violating the company's Code of Conduct, and the termination was not related to any disability, perceived disability, or medical condition. *See* Hawd's Verified Statement, ¶¶ 5, 7; Smith's Verified Statement, ¶¶ 5-6. Smith even asserts that he did not see Plaintiff in person or speak with him after his alleged seizure, making it highly unlikely that he would perceive Plaintiff to be disabled. Smith's Verified Statement, ¶ 3. Although Plaintiff argues that the evidence demonstrates perceived disability discrimination because Defendants requested documentation from Plaintiff, Defendants just wanted to determine whether Plaintiff had any restrictions relating to his return to work and this "was no different than any other situation . . . ." Smith Dep., 58:6-17; 62:7-11. Therefore, Plaintiff has failed to show that Defendants entertained misperceptions about him or thought he had a substantially limiting impairment. *Glenn*, 2012 WL 933335, at *7. Instead, the evidence shows that Defendants displayed a normal amount of concern for Plaintiff's medical condition, adhered

to standard procedure by asking for a doctor's note, and terminated Plaintiff for reasons wholly unrelated to any alleged disability or perceived disability. As a result, Plaintiff has not demonstrated a prima facie case of perceived disability discrimination, meaning there is no genuine issue of material fact, and Defendants are entitled to judgment as a matter of law on this issue.

### 2. Plaintiff Has Not Demonstrated that Defendants Failed to Make Reasonable Accommodations On Account of His Alleged Disability

"An employer 'must make a reasonable accommodation to the limitations of an employee . . . who is a person with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship.'" *St. Cyr v. Brandywine Senior Living, LLC*, 2012 WL 2344858, *8 (D.N.J. Jun. 20, 2012) (quoting N.J. Admin. Code tit. 13, § 13-2.5). To establish a "prima facie case of disability discrimination in the form of failure to accommodate . . . , the plaintiff must demonstrate that he was otherwise qualified to perform the essential functions of the job, either with or without accommodation." *Id.* "As a preliminary matter, the employee must make a reasonable accommodation request," which "may be oral or written and do[es] not have to be made explicitly." *Rosenfeld v. Canon Bus. Solutions, Inc.*, 2011 WL 4527959, *14 (D.N.J. Sept. 26, 2011). The "employee must simply make clear that he desires assistance for his disability." *Sunkett*, 2011 WL 6719776, at *13. "Once an employee requests a reasonable accommodation, the employer is obliged to engage in an interactive process to attempt to fashion an appropriate reasonable accommodation." *Rosenfeld*, 2011 WL 4527959, at *14. A "disabled employee can show that his employer failed to participate in this interactive process by demonstrating that: (1) The employer knew about the employee's disability; (2) *The employee requested accommodation or assistance for his disability;* (3) The employer did not

14

make a good faith effort to assist the employee in seeking accommodation; and (4) The employee could have been reasonably accommodated but for the employer's lack of good faith." *Sunkett*, 2011 WL 6719776, at *12-13 (emphasis in original).

Here, Plaintiff has not established a prima facie case of discrimination based on a failure to accommodate because not only has Plaintiff failed to establish that he is disabled, *see supra* 11-14, but Plaintiff never requested an accommodation. *See* Photis Dep., 77:10-12, 77:22-78:1, 100:6-11. Plaintiff never made clear to Defendants that he desired assistance for his disability because he worked every day from the date he returned to work until the date he was suspended, and he just provided hospital discharge papers, which did not state that he needed any accommodations, to Defendants. Thus, Plaintiff has failed to demonstrate a prima facie case of failure to provide a reasonable accommodation, meaning there is no genuine dispute of material fact, and Defendant is entitled to judgment as a matter of law on this claim.

### 3. Defendants' Legitimate, Nondiscriminatory Reason for Plaintiff's Termination

Because Plaintiff has not established a prima facie case of disability, perceived disability, or reasonable accommodation discrimination, he has failed to establish the first prong of the *McDonnell Douglas* test, and this Court is not required to discuss the other two prongs of the test to grant Defendants' Motion for Summary Judgment as to the NJLAD claims. As a matter of completeness, however, this Court will discuss Defendants' legitimate, nondiscriminatory reason for Plaintiff's termination as well as why this reason is not pretextual.

Defendants' legitimate, nondiscriminatory reason for Plaintiff's termination is that Plaintiff violated the company's Code of Conduct by making false statements during the investigation related to the SYWR cards. *See* Hawd's Verified Statement, ¶ 7; Smith's Verified

Statement, ¶ 5. Specifically, Plaintiff lied when he said he has "not seen or have been made aware of anyone in this building fraudulently signing up . . . [SYWR] or anything else that could be a violation of company policy" or "even frowned upon." Hawd Dep., 116:5-24; Michal Dep., 49:7-13. These statements contradict the following facts: (1) Patel saw Plaintiff enter phone numbers from his cell phone into a RMU and then scan SYWR cards; (2) SYWR rules require an associate to sign up a customer when the customer is present; and (3) as Store Manager, Plaintiff was required to know about the program rules, knew someone could be terminated for failing to abide by them, and was required to set a good example for his employees. Patel's Associate Witness Statement; Photis Dep., 50:7-15, 53:11-19; Smith Dep., 82:5-8; Smith Dep., Ex. 2. Additionally, Plaintiff's statements contradict Feijo and Simpson's testimony because they both said that Plaintiff "hinted to sign up friends & family" or "relatives and neighbors" to meet SYWR program goals [docket # 15-4, Ex. I, Statement of Anthony Feijo; Ex. J., Simpson Statement]. Thus, Plaintiff lied during the investigation, thereby violating the company's Code of Conduct, and this was Defendants' legitimate, nondiscriminatory reason for terminating his employment.

### 4. Defendants' Legitimate, Nondiscriminatory Reason for Terminating Plaintiff's Employment Is Not Pretextual

Plaintiff is unable to show that Defendants' legitimate, nondiscriminatory reason for Plaintiff's termination — that Plaintiff violated the Code of Conduct — is pretextual. First, Defendants initiated the investigation into the improperly created SYWR accounts on January 11, 2011, which is almost one month before Plaintiff's seizure. Houde Dep., 30:10-18, 61:20-24; Michal Dep., 11:25; Smith Dep., 35:5-12. Second, several people discussed the "integrity issue" associated with Plaintiff's statements regarding the SYWR program and determined that "termination would be appropriate," meaning several people arrived at the decision to terminate

Plaintiff for violating the Code of Conduct and a discriminatory intent is not evident in their decision.  Michal Dep., 50:14-24; *see also* Hawd Dep., 112:22-113:13; Michal Dep., 11:20-12:3; 13:9-10; 44:12-19; Smith Dep., 69:3-10.  Moreover, the fact that Feijo was not terminated is not evidence of pretext because:  (1) Feijo is not similarly situated to Plaintiff since Feijo is not a Store Manager and therefore, is not required to know the SYWR rules and set a good example for associates regarding the SYWR program; and (2) Feijo was truthful and acknowledged what he had done wrong.  *See Thompson v. Merck & Co., Inc.*, 2006 WL 2129105, *4 (E.D. Pa. Jul. 27, 2006) (noting that one way to demonstrate pretext is to show "that the employer treated other, similarly situated persons not of his protected class more favorably"); *see also* Hawd Dep., 131:5-14; Photis Dep., 50:7-15, 53:11-19.

Thus, Plaintiff did not demonstrate the three prongs of the *McDonnell Douglas* test.  First, Plaintiff did not establish a prima facie case of disability, perceived disability, or failure to accommodate discrimination.  Second, Defendants offered a legitimate, nondiscriminatory reason for Plaintiff's termination — he violated the Code of Conduct.  Lastly, Plaintiff did not establish that Defendants' legitimate, nondiscriminatory reason was pretextual.  As a result, there is no genuine issue of material fact regarding Plaintiff's NJLAD claims, meaning Defendants are entitled to judgment as a matter of law, and this Court grants Defendants' Motion for Summary Judgment as to those claims.

### C. Aiding and Abetting Discrimination Claim

Defendants argue that Plaintiff cannot establish count five — that Smith aided and abetted discrimination based upon Plaintiff's disability and perceived disability — because since Sears Holding Corporation is not liable under NJLAD, Smith is not liable for aiding and abetting

discrimination. Defendants contend, however, that if Plaintiff could pursue an aiding and abetting claim, Plaintiff did not produce any evidence to support such a claim because he did not show any active and purposeful conduct by Smith that constituted a wrongful act which caused Plaintiff's injury. Plaintiff did not address this argument in his opposition brief.

Although "there is no direct individual liability under the NJLAD, the statute does recognize that individuals may be liable under a theory of aiding and abetting." *Simonetti*, 2012 WL 32931, at *11. To establish an aiding and abetting claim against an employee, a plaintiff must show: "(1) that the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortuous activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Id.* (internal quotation omitted). "It is only possible to find an individual liable for aiding and abetting under the [NJ]LAD, however, when the employer may be held liable under the" statute. *Roman v. Waste Management of New Jersey*, 2011 WL 1807642, *5 (D.N.J. May 12, 2011). Here, the aiding and abetting claim against Smith fails because the Court granted Defendants' Motion for Summary Judgment as to the NJLAD claims against Sears Holding Corporation.

### D. Intentional Infliction of Emotional Distress Claim

Defendants argue that summary judgment should be granted on the intentional infliction of emotional distress claim because: (1) it is preempted by the NJLAD claims since both claims are based upon the same allegations; and (2) Plaintiff cannot establish the elements of an intentional infliction of emotional distress claim. Plaintiff failed to address this argument in his opposition brief.

To establish intentional infliction of emotional distress, a plaintiff must prove that: "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was outrageous; (3) the defendant's actions proximately caused plaintiff's emotional distress; and (4) plaintiff's emotional distress was so severe that no reasonable man could be expected to endure it." *Swingle*, 2009 WL 2778106, at *8 (internal quotation omitted). A defendant must act "with the intent to do the act and to produce the emotional distress or in deliberate disregard of a high degree of probability that emotional distress will follow." *Id.* In addition, the conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (internal quotation omitted).

It is "extremely rare to find conduct in the employment context which will rise to the level of outrageousness necessary to provide a basis for recovery." *Id.* (internal quotation omitted). Indeed, "New Jersey courts do not perceive terminations of employment, in and of themselves, as evidence of the intentional infliction of emotional distress, but rather as a common occurrence in the workplace." *Lemke v. Int'l Total Servs., Inc.*, 56 F. Supp.2d 472, 488-89 (D.N.J. 1999), *aff'd*, 225 F.3d 649 (3d Cir. 2000), *cert. denied*, 531 U.S. 1152 (2001). "Even terminations based on discrimination, without accompanying harassment or something akin thereto, do not state a cause of action for the intentional infliction of emotional distress." *Id.* at 489.

Here, Plaintiff has not established that his termination caused an intentional infliction of emotional distress. There is no evidence that Defendants acted "with the intent . . . to produce emotional distress or in deliberate disregard of a high degree of probability that emotional distress will follow." *Swingle*, 2009 WL 2778106, at *8. Moreover, Defendants' conduct was

19

not outrageous; instead, this situation is a mere termination of employment, and "intentional infliction of emotional distress is reserved for conduct that goes well beyond" this. *Lemke*, 56 F. Supp. 2d at 489. Lastly, this intentional infliction of emotional distress claim is based on "the same allegations supporting Plaintiff's" NJLAD claims, meaning the intentional infliction of emotional distress claim is preempted because "supplementary common law causes of action may not go to the jury when a statutory remedy under the [NJ]LAD exists." *Quarles v. Lowe's Home Centers, Inc.*, 2006 WL 1098050, *11 (D.N.J. Mar. 31, 2006). Accordingly, this Court grants Defendants' Motion for Summary Judgment as to Plaintiff's intentional infliction of emotional distress claim.

### III. CONCLUSION

For the reasons outlined above, this Court grants Defendants' Motion for Summary Judgment. An appropriate Order accompanies this Opinion.

Dated: July 25, 2013

/s/ Joel A. Pisano
JOEL A. PISANO
United States District Judge